IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

| | | |
|---|---|---|
| Penn National Security | ) | |
| Insurance Company | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C/A No.: 2:11-cv-02043-PMD |
| | ) | |
| Design-Build Corporation, | ) | **ORDER** |
| Stephen W. Mueller, | ) | |
| Metalworx, Inc., and | ) | |
| Sealake Associates, LLC, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

This matter is before the Court upon Plaintiff Penn National Security Insurance Company's ("Plaintiff" or "Penn National") motion for summary judgment and Defendants Stephen W. Mueller ("Mr. Mueller") and Design-Build Corporation's ("Design-Build") motion for leave to amend. Based on the following, the Court grants in part and denies in part Penn National's motion for summary judgment and denies Mr. Mueller and Design-Build's motion for leave to amend.

**BACKGROUND**

I.    The Building

On November 8, 2004, Sealake Associates, LLC ("Sealake") and Metalworx, Inc., ("Metalworx") entered into a contract with Design-Build "to design, build and construct the [Building]." Compl. ¶ 9. Design-Build's scope of work included all of the work related to the design and construction of the concrete slab for the Building. Design-Build performed the majority of the work with its own employees, including the design work for the concrete slab, which was performed by an engineer-employee of Design-Build. Design-Build also hired two

1

subcontractors—Baucom's Grading and Salley Concrete Finishing.    As subcontractors for Design-Build, Baucom's Grading prepared the pad, paving, rocking, and concrete curve for the Building, and Salley Concrete Finishing placed and finished the concrete slab for the Building. In December 2005, Design-Build completed its work on the Building, and Metalworx began moving its equipment into the Building.

On December 10, 2005, Design-Build submitted a final invoice to Metalworx for payment of $259,190—the amount still due under the contract.  When it remained unpaid, Mr. Mueller of Design-Build asked Michael Sawer ("Mr. Sawer"), the principal of Metalworx, about the unpaid invoice.  In response, Mr. Sawer told Mr. Mueller that there was a problem with the concrete slab "moving."  According to Mr. Sawer, Metalworx began operating its fabricating machinery in the Building in January 2006, but quickly noticed slab movement. According to Mr. Sawer, the slab movement became obvious once they began operating machines and forklifts on the slab.

Design-Build hired a contractor to attempt a limited repair to one portion of the concrete slab.  Mr. Sawer was not satisfied with the attempted repair and declined to have such repair performed on the remainder of the concrete slab.  In May 2007, counsel for Metalworx sent a letter to Design-Build detailing a claim against Design-Build for over $2.6 million related to the construction of the Building.

II.    The Underlying Litigation

On January 21, 2009, Metalworx and Sealake filed a lawsuit against Design-Build and Mr. Mueller, seeking to recover damages for alleged design and construction defects relating to the Building. The Complaint alleges that "as a result of the various defects and deficiencies relative to the design and construction of this building, [Metalworx and Sealake] have been

2

damaged and will be required to expend large sums of money to repair, correct and replace

various parts and components of their building and reconstruct major portions, have been

exposed to and will be subject to loss of use and loss of profits and depreciation of the value of

its property." Compl. ¶ 7.   Various causes of action are asserted against Design-Build and Mr.

Mueller in the Underlying Lawsuit, including (1) Breach of Contract, (2) Negligence, (3) Breach

of Warranty of Habitability, Breach of Warranty of Workmanlike Services, Breach of Warranty

for Fitness for a Particular Purpose, Breach of Warranty of Merchantability and Breach of

Warranty against Latent Defects; and (4) Unfair Trade Practices.   Specifically, the Complaint

alleges that Design-Build and Mueller failed to design, construct, and repair the Building

properly. Compl., ¶¶ 10, 14, 18, and 22. As a result, Metalworx and Sealake seek to recover

damages for the expenses to hire experts to investigate the causes of the defects of the Building;

the expense to renovate, correct, repair, remediate, and restore the Building; the loss of use and

profits of their property and business; and the loss of valuation and depreciation of their property

by virtue of the defects and damages.  Compl. ¶¶ 11, 15, 19, and 26.

    III.    The Penn National Commercial General Liability and Umbrella Policies

        Penn National issued two of insurance policies to Design-Build—a Commercial General

Liability Policy ("CGL Policy")[1] and an Umbrella Policy.[2]  The CGL policy provides that Penn

National "will pay those sums that the insured becomes legally obligated to pay as damages

because of 'bodily injury' or 'property damage' to which this insurance applies."  Pl.'s Mot.

Summ. J. ex. 4, §1, ¶1.a. ("CGL Policy").  Additionally, Penn National has the "the right and

_____

[1] Penn National issued multiple CGL Policies.  Together these polices covered from January 29,
2004 through October 1, 2007.  While these CGL Policies had different coverage periods, the
relevant policy provisions are identical.  Therefore, the court will simply refer to the "CGL
Policy".

[2] The Umbrella Policy was only in effect from June 6, 2007 through October 1, 2007.  That
policy includes many, but not all, of the provisions included in the CGL policy.

duty to defend the insured against any 'suit' seeking those damages [to which the insurance policy applies]." *Id.* The policy provides coverage for "property damage" when "[it] is caused by an 'occurrence' . . . ." *Id.* at §1 ¶1. b.

The policy also includes several exclusions that are relevant in this case: the "Your Work," "Impaired Property," and "Professional Liability" exclusions. The "Your Work" exclusion provides that "[t]his insurance does not apply to: . . . 'Property damage' to 'your work' arising out of it or any part of it and included in the 'products-completed operations hazard.'" CGL Policy §I ¶ 2. l. The CGL Policy defines "Your Work" as "(1) Work or operations performed by you or on your behalf; and (2) Materials, parts or equipment furnished in connection with such work or operations." §V ¶ 22 a. That definition includes "(1) Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your work"; and (2) The providing of or failure to provide warnings or instructions." §5 ¶ 22 b. Additionally, in this case the insurance contract contains an endorsement, CG 22 94 10 01, that removes the standard subcontractor exception from the "Your Work" exclusion.

The "Impaired Property" exclusion provides that "'[p]roperty damage' to 'impaired property' or property that has not been physically injured, arising out of: (1) A defect, deficiency, inadequacy or dangerous condition in "your product" or "your work"; or (2) A delay or failure by you or anyone acting on your behalf to perform a contract or agreement in accordance with its terms." CGL Policy §I ¶ 2. m. "This exclusion does not apply to the loss of use of other property arising out of sudden and accidental physical injury to "your product" or "your work" after it has been put to its intended use." *Id.*

Finally, the "Professional Liability" exclusion, which was added to the exclusions section of the policy by an endorsement, provides that "[t]his insurance does not apply to . . . 'property

damage' . . . arising out of the rendering of or failure to render any professional services by you or on your behalf." CG 22 79 07 98. The specific operations within the scope of the "Professional Liability" exclusion are: "[p]roviding engineering . . . services to others in your capacity as an engineer" or "[p]roviding, or hiring independent professionals to provide, engineering . . . services in connection with construction work you perform." *Id.*

IV.    Procedural history of this action

Plaintiff filed this Declaratory Judgment Action against Design-Build, Mr. Mueller, Metalworx, and Sealake seeking a declaration that the Commercial General Liability Policies and Umbrella Policy issued by Penn National to Design-Build do not provide coverage for the underlying lawsuit. Penn Nation has filed a motion for summary judgment, Defendants have responded, and Penn National has replied to their response. Additionally, Defendants Mr. Mueller and Design-Build have filed motion for leave to amend their answer. Penn National has responded to that motion.

**LEGAL STANDARD FOR SUMMARY JUDGMENT**

To grant a motion for summary judgment, the Court must find that "there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The judge is not to weigh the evidence, but rather to determine if there is a genuine issue of fact for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). If no material factual disputes remain, then summary judgment should be granted against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which the party bears the burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). All evidence should be viewed in the light most favorable to the non-moving party. *Perini Corp. v. Perini Constr., Inc.*, 915 F.2d 121, 123–24 (4th Cir. 1990). Summary judgment

5

is not "a disfavored procedural shortcut," but an important mechanism for weeding out "claims

and defenses [that] have no factual bases." *Celotex*, 477 U.S. at 327.

## DISCUSSION

I.      "Property Damage" caused by an "Occurrence"

In order to determine whether the CGL Policy provides coverage, the Court must first

determine whether the underlying lawsuit includes a claim for "property damage" caused by an

"occurrence."   "[F]aulty workmanship standing alone, resulting in damage only to the work

product itself, does not constitute an occurrence under a CGL policy."  *See Builders Mut. Ins.*

*Co. v. R Design Constr. Co.*, LLC, C/A No. 2:07-1890, 2010 WL 2079741, at *5 (D.S.C. May

24, 2010) (quoting *L–J, Inc. v. Bituminous Fire & Marine Ins. Co.*, 621 S.E.2d 33, 35

(S.C.2005)).   "The rationale behind this rule is that a CGL policy is not a performance bond."

*Id*. (citation omitted). "It is an insurance policy, which is intended to insure against accidents."

*Id.* (citation omitted).  "But if the faulty workmanship causes damage to property other than the

defective work product itself, there may be an 'occurrence' triggering coverage."  *Id.* (citing

*Auto Owners Ins. Co. v. Newman*, 684 S.E.2d 541, 544–45 (S.C.2009)).

> In [*Auto Owners Ins. Co. v.*] *Newman*, a subcontractor negligently applied stucco
> to an otherwise sound structure. Shortly after the construction was completed, the
> homeowner filed a claim against the general contractor alleging that the
> negligently applied stucco allowed moisture to seep into the house, causing water
> damage to the home's exterior sheathing and wooden framing. [*Newman*, 684
> S.E.2d] at 190, 684 S.E.2d at 542. The arbitrator ruled in favor of the homeowner.
> *Id.* Following arbitration, the insurance company filed a declaratory judgment
> action seeking a determination of the rights and obligations under the CGL policy
> issued to the general contractor. *Id.* at 190, 684 S.E.2d at 542–43. The trial court
> determined that the policy provided coverage because the damage complained of
> was caused by an occurrence. *Id.* at 190, 684 S.E.2d at 542–43. The supreme
> court agreed.
>
> The supreme court found that there was property damage beyond the defective
> work product itself. *Id.* The court explained that "although the subcontractor's
> negligent application of the stucco does not on its own constitute an 'occurrence,'.

> . . the continuous moisture intrusion resulting from the subcontractor's negligence is an 'occurrence' as defined by the CGL policy." *Id.* The court further determined that "the continuous moisture intrusion into the home was 'an unexpected happening or event' not intended by [the general contractor]—in other words, an 'accident'—involving 'continuous or repeated exposure to substantially the same harmful conditions.' " *Id.* at 544–45. As a result, the court held that "the subcontractor's negligence resulted in an 'occurrence' falling within the CGL policy's initial grant of coverage for the resulting 'property damage' to the home's framing and exterior sheathing." *Id*. at 545.

Since *Newman*, the South Carolina Supreme Court decided the much discussed *Crossman Communities of N.C., Inc. v. Harleysville Mutual Insurance Company*, ("*Crossman II*"), 717 S.E.2d 589, 592–95 (2011). As is obvious after looking at South Carolina law on "occurrence," whether a complaint states facts that are an "occurrence" under the policy cannot be determined in a vacuum, but need to be considered with reference to whether "property damage" was caused by an "occurrence." *Id.* at 593 (noting that in a progressive property damage case "a more complete understanding of the coverage issue should involve the policy term 'property damage'"). The policy defines "property damages" as "[p]hysical injury to tangible property, including all resulting loss of use of that property." CGL Policy §5 ¶17. a. In interpreting this language, the supreme court has stated the following:

> the critical phrase is "physical injury," which suggests the property was not defective at the outset, but rather was initially proper and injured thereafter. We emphasize the difference between a claim for the costs of repairing or removing defective work, which is not a claim for "property damage," and a claim for the costs of repairing damage caused by the defective work, which is a claim for "property damage."

*Crossman II*, 717 S.E.2d at 593 (internal quotations and citations omitted). In other words, "property damage" is only physical injury to tangible property beyond damage to the work product itself.

Metalworx and Sealake have alleged, in the underlying lawsuit, that Design-Build's defective design and construction of the Building damaged Metalworx and Sealake because they have and will continue to have to "expend large sums of money to repair, correct and replace various parts and components of their building and reconstruct major portions, [and] have been exposed to and will be subject to loss of use and loss of profits and depreciation of the value of its property." Compl. ¶¶ 6–9. Those damages can be divided into three categories: (1) repair, correction, and replacement of various parts and components of the Building (2) loss of use and loss of profits, and (3) depreciation of the value of its property.

The damage to the building does not fall within the scope of the policy; such damage is not "property damage" caused by an "occurrence." That damage is damage to the work product itself, allegedly caused by faulty workmanship. Such damages do not constitute an occurrence under a CGL policy. *See Builders Mut. Ins. Co.*, 2010 WL 2079741, at *5 (stating that "faulty workmanship standing alone, resulting in damage only to the work product itself, does not constitute an occurrence under a CGL policy" (quoting *L–J, Inc. v. Bituminous Fire & Marine Ins. Co.*, 621 S.E.2d 33, 35 (S.C. 2005))).

Like the damage to the building, the loss of use of the property and loss of profits are not "property damage" caused by an "occurrence." Assuming such damages could meet the definition of being caused by an "occurrence," they clearly do not fall within the scope of the policy's definition of "property damage," because they are not "[p]hysical injury to tangible property."

The third category of damage—depreciation of the value of its property—is not described in detail until Metalworx and Sealake's memorandum in opposition to Penn National's motion for summary judgment. In that filing, Metalworx and Sealake argue that (1) "as a result of

8

repeated movements of the slab" the soil underneath the building has been damaged and (2) "arising from repeated movements of the slabs[,] [the] large high-precision metal fabricating, milling, cutting and welding machines" have been damaged.  Metalworx and Sealake Opp Mem. to Pl.'s Mot. Summ. J., at 3.  Whether these alleged damages constitute "property damage" caused by an "occurrence," and if so, whether any exclusions apply has not been fully briefed. Therefore, while the Court grants Plaintiff's motion for summary judgment as to whether the policy provides coverage for the Building, the loss of use of the property, and the loss of profits, the Court declines to grant summary judgment as to whether these damages are covered by the policy.

II.    Policy Exclusions

The three relevant policy exclusions— "Your Work," "Impaired Property," and "Professional Liability"—squarely apply to much of the damage alleged in this case.  For example, any damage to the Building would clearly be excluded by the "Your Work" exclusion. *See* CGL Policy §i ¶2.l. ("This insurance does not apply to: . . . 'property damage' to 'your work' arising out of it").   Also, the loss of use of machinery in the Building and the loss of profits from that loss of use would probably be excluded by the "Impaired Property" exclusion.  *See* CGL Policy §I ¶2.m.  Additionally, the "Professional Liability" exclusion would also preclude any damages cause by any design or engineering mistakes, as distinguished from construction errors. *See* CG 22 79 07 98. ("This insurance does not apply to  . . . 'property damage' . . .  arising out of the rendering of or failure to render [engineering] services by you or on your behalf. . .").

Defendants do not argue that the language of these exclusions would not preclude coverage on these points, but rather focus their arguments on why these exclusions are unenforceable.

(i)      *Isle of Palms Pest Control Comp. v. Monticello Ins. Co.*

Defendants argue that the CGL Policy provides coverage because the exclusions render the policy meaningless and exclude from coverage the essential purpose of the policy.  The South Carolina Court of Appeals has found that a policy's exclusions are unenforceable if they create an internal inconsistency by excluding from coverage the very risk contemplated by the parties.  *See Isle of Palms Pest Control Co. v. Monticello Ins. Co*., 459 S.E.2d 318, 321 (S.C. Ct. App. 1995).  In *Isle of Palms*, the purchaser of a home brought suit against the pest control company alleging that the home they purchased was infested at the time the pest control company issued a termite inspection letter stating that there was no visible evidence of infestation.  The lawsuit alleged that the pest control company negligently conducted the inspection.  The pest control company brought a declaratory judgment action against its insurer, Monticello, seeking a declaration that the CGL policy the pest control company purchased from Monticello provided coverage.  The court found that the policy applied to provide coverage, but the "Professional Liability" exclusion excluded coverage.  The "Professional Liability" exclusion stated that "[a]ll coverage is excluded hereunder for claims arising out of the rendering or failure to render of any professional service by any Insured or any Additional Named Insured."  *Id.* at 320.  However, the court determined that the Professional Liability exclusion should not be enforced to exclude coverage:

> [t]o give effect to the professional liability exclusion would render the policy virtually meaningless, because it would exclude coverage for all claims arising from Isle of Palms' exterminating services, the very risk contemplated by the parties. The internal inconsistency created by an exclusion which purports to bar coverage for claims arising out of the very operation sought to be insured renders the policy ambiguous, and we must resolve that ambiguity in favor of coverage.

*Id.* at 321 (internal citations omitted).

10

In this case, the exclusions do not render the policy meaningless, or create an internal inconsistency by attempting to exclude coverage for the very risk contemplated by the parties. *Isle of Palms* only specifically dealt with a "Professional Liability" exclusion.  The "Professional Liability" exclusion in that case was remarkably broader than the "professional liability" in the CGL Policy at issue here.  The exclusion in *Isle of Palms* attempted to exclude from coverage all claims arising out of performing any professional service.  *See id.* at 320.    In contrast, the exclusion in this case merely excludes from coverage claims for "'bodily injury,' 'property damage' or 'personal and advertising injury' arising out of the rendering of or failure to render any professional services by you or on your behalf."  The CGL Policy goes on to define what professional services are included in the exclusion—engineering, architectural or surveying services—and what services are not included within the exclusion—"services within construction means, methods, techniques, sequences and procedures employed by you in connection with your operations in your capacity as construction contractor."  CG 22 79 07 98. Clearly, the "Professional Liability" exclusion here, which is much more specific, avoids creating an internal inconsistency because the policy still provides coverage for numerous risks contemplated by the parties.[3]

---

[3] Penn National provides the following examples of claims that would still be covered under the CGL policy:

> [C]overage would be provided for any type of "bodily injury" arising out of an occurrence either before or after the completion of construction (e.g. if a metal beam became dislodged and caused injury to a worker or visitor standing below). . . coverage would [also] be provided for "property damage" arising out of an occurrence during construction of the Building (e.g. if the same metal beam became dislodged during construction of the building and struck a machine that had been moved into the Building or a vehicle parked alongside the Building).

Penn National's Reply to Defs. Mem. in Opp'n. of Summ. J., at 5.

In addition to the "Professional Liability" exclusion which was specifically addressed in *Isle of Palms*, the "Your Work" exclusion and the "Impaired Property" exclusions do not create any internal ambiguity by excluding from coverage the primary purpose of the policy. These exclusions do not exclude every claim from coverage. Simply because certain types of damage have been excluded from coverage, does create an internal inconsistency of the type at issue in *Isle of Palms* where the insurer attempts to exclude from coverage all claims that may have arisen from the activities of the insured.

    (ii)    <u>CG 22 94 10 01 endorsement to the "your work" exclusion</u>

Defendants Metalworx and Sealake argue that the CG 22 94 10 01 endorsement—the endorsement that removes the standard subcontractor exception from the "Your Work" exclusion—should not be enforced because it was inserted into the policy without notice. Metalworx and Sealake do not assert that Design-Build never received the endorsement, but rather highlight that Penn National cannot produce a copy of the actual endorsement they sent. Penn National responds with testimony that the endorsement was sent and explains the business context in which it was sent. *See* Reply in Supp. of Summ. J., 11-12 (citing the deposition testimony of Allan Stowe, Penn National's commercial line underwriting manager to explain that the CG 22 94 10 01 endorsement was added as a compromise to avoid cancelation of the CGL Policy in response to Design-Build's repeated use of uninsured contractors). The fact that Penn National cannot produce a copy of what was sent does not create a factual dispute with Penn National's evidence explaining why it was sent and that it was sent. To the extent Penn National was required to provide special notice that the endorsement was being added, Defendants have failed to present any evidence disputing Penn National's evidence that it was sent.

12

III.    Duty to Defend

The duty to defend is separate and distinct from the obligation to pay a judgment rendered against the insured. *Am. Cas. Co. v. Howard*, 187 F.2d 322, 327 (4th Cir. 1951).  The duty of an insurance company to defend its insured against a lawsuit is governed by the language contained in the insurance policy and the allegations made in the lawsuit. *Liberty Life Ins. Co. v. Commercial Union Ins. Co.*, 857 F.2d 945, 949-50 (4th Cir. 1988).  *See also USAA Prop. & Cas. Ins. Co. v. Clegg*, 661 S.E.2d 791, 797 (S.C. 2008).  "If the facts alleged in the complaint raise a reasonable possibility that the insured may be held liable for some act or omission covered by the policy, then the insurer must defend."  *Liberty Life Ins. Co.*, 857 F.2d at 949.

Having determined that it would be premature for the Court to rule as to whether the CGL Policy provides coverage for damage to the soil underneath the building or damage to the large high-precision metal fabricating, milling, cutting and welding machines, the Court also declines to grant summary judgment as to whether Penn National has a duty to defend Design-Build and Mr. Muller in the underlying lawsuit.  Such a decision is premature because whether Penn National has a duty to defend in the underlying lawsuit is intertwined with the question of coverage.  *See Sloan Constr. Co., Inc. v. Central Nat. Ins. Co. of Omaha*, 236 S.E.2d 818,820 (S.C. 1977) ("Although these duties are related in the sense that the duty to defend depends on an initial or apparent potential liability to satisfy the judgment, the duty to defend exists regardless of the insurer's ultimate liability to the insured.").

IV.    The Penn National Umbrella Policy Coverage

In addition to the CGL Policy, Penn National issued the Umbrella Policy to Design-Build.  The Umbrella Policy was in effect from June 6, 2007 through October 1, 2007, when the Policy was cancelled at the request of the insured.  The "Insuring Agreement" in the Penn National Umbrella Policy provides that coverage only applies if "[p]rior to the policy period, no insured . . .

13

knew that the 'bodily injury' or 'property damage' had occurred, in whole or in part. If such a[n] . . .

insured . . . knew, prior to the policy period, that the 'bodily injury' or 'property damage' occurred,

then any continuation, change or resumption of such 'bodily injury' or 'property damage' during or

after the policy period will be deemed to have been known prior to the policy period." Umbrella

Policy§I,1.b.(3).   Whether an insured knew that the "bodily injury" or "property damage" had

occurred prior to the policy period is determined by the following standard:

> "Bodily injury" or "property damage" will be deemed to have been known to have occurred at the earliest time when any insured . . . or any "employee" authorized by you to give or receive notice of an "occurrence" or claim:
>
> (1) Reports all, or any part, of the "bodily injury" or "property damage" to us or any other insurer;
>
> (2) Receives a written or verbal demand or claim for damages because of the "bodily injury" or "property damage"; or
>
> (3) Becomes aware by any other means that "bodily injury" or "property damage" has occurred or has begun to occur.

Umbrella Policy§ I ,1.d.   In seeking summary judgment that the Umbrella Policy does not

provide coverage, Penn National presents the following evidence that the insured knew that the

"property damage" occurred prior to the policy period:

> (1) The vice President of Design-Build Steve Muller testified in his deposition that he was informed by Mr. Michael Lee Sawer of Metalworx, prior to the effective date of the Penn National Umbrella Policy, that there was a problem with the concrete slab for the Building.
>
> (2)  Mr. Mueller also testified that, prior to the effective date of the Penn National Umbrella Policy, he personally observed the movement of the concrete slab at the Building.
>
> (3) Mr. Mueller testified that prior to the effective date for the Umbrella Policy, he was aware that Metalworx was dissatisfied with the construction of the concrete slab and the attempted repair.
>
> (4) Mr. Muller also testified that prior to the effective date for the Umbrella Policy, Design-Build was in possession of a letter from counsel retained by

14

> Metalworx laying out a claim of over $2.6 million against Design-Build in relation to the construction of the Building.

Pl.'s Mot. Summ. J., exhibit C (Dep. of Stephen W. Mueller) pp. 7–9, 29–33, 35, 46, exhibit 11. *See also* Pl.'s Mot. Summ. J., exhibit D Dep. of Michael Lee Sawer, pp. 26–28 (confirming that prior to the effective date of the Penn National Umbrella Policy, he had already informed Steve Muller that there was a problem with the concrete slab for the Building).

These facts are clearly sufficient to satisfy the broadest standard provided in the Umbrella Policy: "property damage" will be deemed to have been known to have occurred at the earliest time when any insured. . . "[b]ecomes aware by any other means that "bodily injury" or "property damage" has occurred or has begun to occur."    Defendants do not present any evidence contrary to Penn National's version above, but rather simply argue that a factual issue exists.    Therefore, as Defendants have not presented any evidence that Design-Build did not know that the property damage occurred or had begun to occur prior to the effective date of the Umbrella Policy—June 6, 2007—the Court finds that Penn National is entitled to summary judgment that the Umbrella Policy does not provide coverage.

V.    Motion to Amend

After filing their response to Plaintiff's motion for summary judgment, Defendants Design Build and Mr. Muller filed a motion to amend their answer to include counterclaims based on the assertion in their response that the CGL Policy provides no coverage at all.  Having granted summary judgment as to that argument, the Court denies the motion to amend as the proposed amendments would be futile.  *See Ward Electronics Serv., Inc. v. First Commercial Bank*, 819 F.2d 496, 497 (4th Cir. 1987) (mentioning that "futility of [the proposed] amendment" as one reason a court may deny a motion to amend).

**CONCLUSION**

Based on the foregoing, the Court finds that (1) the CGL Policy does not provide coverage for damages to the Building; (2) the CGL Policy does not provide coverage for loss of

15

use of the machines or loss of profits; (3) the Umbrella Policy does not provide coverage; (4) a decision as to whether the CGL Policy provides coverage for damages to the soil under the Building or damage to the large high-precision metal fabricating, milling, cutting, and welding machines that were in the Building is premature; and (5) a decision as to whether the CGL Policy requires Penn National to defend is also premature; and (6) allowing Defendants leave to amend their answer would be futile.

Therefore, the Court **ORDERS** that Plaintiff's motion for summary judgment be **GRANTED IN PART** and **DENIED IN PART.**    Additionally, the Court **ORDERS** that Defendants Design-Build and Mr. Muller's motion to amend their answer is **DENIED.**

**AND IT IS SO ORDERED.**

PATRICK MICHAEL DUFFY
United States District Judge

**July 9, 2012**
**Charleston, SC**

16